**In re FARMER'S MARKET, a limited partnership, Debtor.**

**Craig ETCHEGOYEN Sharon Etchegoyen and John P. Sweeny, Appellants,**

v.

**Robert S. HAMILL, William W. Wilcox and Robert H. Stopher, Appellees.**

**BAP No. CC–81–1024–GVH.**
**Bankruptcy No. BK–79–05604–PE.**
**Adv. No. SA–80–0100–PE.**

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued April 17, 1981.

Decided July 15, 1982.

Paul B. George, Susan W. Haldeman, Virtue & Scheck, Inc., Newport Beach, Cal., for appellants.

Robert A. Fisher, Irvine, Cal., Stanley Minier, Alberts & Minier, Santa Ana, Cal., for appellees.

## OPINION

Before GEORGE, VOLINN and HUGHES, Bankruptcy Judges.

GEORGE, Bankruptcy Judge:

This is an appeal from a judgment entered on September 3, 1980, quieting title to certain real property in the debtor and holding an earlier transfer of the said real property to the appellants to have been null and void. We REVERSE AND REMAND.

### I. BACKGROUND

The various relationships and transactions underlying this proceeding form a somewhat complex factual picture. It would seem that the appellee, WILLIAM W. WILCOX, and the wife and mother-in-law of the appellee, ROBERT S. HAMILL, are limited partners of the debtor. ANNUITY INVESTMENT, INC., is the debtor's sole general partner. On or about May 15, 1979, DORIS GESSIN, the principal managing officer of Annuity Investment, contacted Hamill and Wilcox and informed them that the debtor's only asset, approximately six acres of real property, located in Riverside County, California, stood in immediate danger of foreclosure. Gessin further notified these appellees that Annuity Investment was not in a position to prevent foreclosure on the property.

Shortly after this conversation, Hamill and Wilcox were approached by LOU KREPEL, who shared office space with Annuity Investment and Doris Gessin. Mr. Krepel was interested, at that time, in knowing whether Hamill and Wilcox had any plans to avoid the foreclosure against this property. Should they not intend to save the property, Krepel noted that he wished to come forward and make such an effort.

Believing the property to be worth much more than the amount of the deed of trust against it, and supposing that Mr. Krepel was in a better position than they to prevent foreclosure, Hamill and Wilcox solicited the latter's services as an intermediary with MR. and MRS. THEODORE W. VANDEN BOSCH, the parties seeking foreclosure. It was agreed, at that time, that Mr. Krepel would receive some $2,000 for his services.

Pursuant to this agreement, Hamill and Wilcox thereafter raised $33,153.27—the amount necessary to pay in full the principal, interest, and costs owed the holders of the trust deed. A cashier's check in this sum was thereupon turned over to Krepel for delivery to Mr. Vanden Bosch. Mr. Vanden Bosch, however, showed displeasure at this payment and insisted that an additional $8,500 payment be made for any reconveyance of his deed of trust prior to the foreclosure date. After Hamill noted that he and Wilcox were not in any position to obtain additional funds, Krepel offered to advance this sum, with the understanding that he would have a twenty percent (20%) share in any surplus obtained from the eventual sale of the real property. (Hamill and Wilcox were to have the remaining eighty percent (80%) portion of this surplus which they planned to use to repay various persons they had talked into becoming limited partners in the debtor and in other partnerships.) Hamill and Wilcox were favorable to this arrangement and the transaction with Vanden Bosch was completed.

Nevertheless, the trial court found that, following the tender of the various sums demanded by Vanden Bosch, the latter returned Mr. Krepel's cashier's check for $6,500, retained the $2,000 paid by Krepel in cash, delivered a request for reconveyance to Krepel, and assigned the debtor's note and trust deed to one R.E. Bonham, admittedly Krepel's associate and his alter ego in this transaction.

Subsequently, Krepel failed to forward the request for reconveyance to the trustee under the Vanden Bosch deed of trust. Instead, he sent the document to Hamill and Wilcox, as evidence of his performance under their agreement for services. Hamill and Wilcox were unfamiliar with the need to deliver this document to the trustee and, thus, failed to do so. Mr. Krepel, however, did notify the trustee of the assignment to Bonham and rescheduled the foreclosure sale for June 29, 1979. At that sale, Krepel purchased the Riverside County property on behalf of Bonham.

In the meantime, on May 25, 1979, an involuntary chapter proceeding under the old Bankruptcy Act was filed against Annuity Investment, Inc. This proceeding was converted to a straight bankruptcy on September 9, 1979. On February 29, 1980, an order for relief under Chapter 7 of the new Bankruptcy Code was entered against the present debtor.

Following his foreclosure upon the debtor's property, Krepel authorized the appellant, JOHN P. SWEENY, to find a buyer for the property. Although there is no written formalization of this arrangement, the record is clear that Krepel offered Sweeny a five percent (5%) commission for his services. The record further shows that Sweeny had dealt with Krepel prior to this time with respect to other real properties.

On June 13, 1979, the appellants, CRAIG and SUSAN ETCHEGOYEN, entered into an agreement with Bonham (Krepel) to purchase the Riverside County property for $200,000. The escrow instructions issued pursuant to this agreement first required a $10,000 down payment, a $90,000 payment at the close of escrow, and the execution of a $100,000 promissory note and deed of trust in favor of Bonham (Krepel). Later, these instructions were modified to call for a payment of $35,000 at the close of escrow, a $65,000 (sic—$75,000) note payable on October 1, 1979, and a longer-term $100,000 promissory note and purchase money deed of trust, for a total purchase price of $210,-000. However, neither Bonham nor Krepel ever signed these escrow instructions.

On or about June 29, 1979, Krepel prepared, in Bonham's name, a note and deed of trust on the subject real property, in the amount of $35,000, in favor of Hamill and Wilcox. The trust deed was forwarded to Hamill, but the note was retained by Krepel until much later.

Confused as to the reason for the Bonham trust deed, Hamill and Wilcox consulted their attorney, Robert A. Fisher. On July 30, 1979, Fisher wrote Krepel seeking an explanation of this document. Immediately thereafter, a number of transactions occurred in rapid succession: On July 31, 1979, a second amended escrow agreement was signed by the appellants and Bonham (Krepel). These instructions allowed Sweeny to have a twenty percent (20%) interest in the subject real property and made the $75,000 promissory note from the Etchegoyens to Bonham payable on January 2, 1980. As with the prior escrow instructions, Continental Equities, another alter ego of Krepel, was designated as the escrow agent. On August 1, 1979, a $25,000 check from the Etchegoyens, dated July 30, 1979, was deposited with Continental Equities and the Etchegoyens and Sweeny were given a grant deed to the property. (Escrow never officially closed on the property.) A title insurance policy was issued in the names of the Etchegoyens and Sweeny on August 3, 1979. The assignment to Bonham of the Vanden Bosch deed of trust was recorded on August 7, 1979. Finally, a re-recording of the grant deed to the Etchegoyens and Sweeny was made on August 17, 1979.

On September 21, 1979, the Etchegoyens and Sweeny borrowed some $110,000 from Pacific City Bank. This loan was secured by what purported to be a first deed of

trust on the Riverside County property. (Krepel waited until February 29, 1980, to record his $100,000 trust deed, ostensibly to permit the appellants to obtain this loan from Pacific City Bank.) At the time of judgment, this loan, which had been renewed by Pacific City Bank, had a principal balance owing of approximately $106,000.

From this set of facts, the trial court concluded that the payment by Hamill and Wilcox had accrued to the benefit of the debtor. That is to say, once the payment was tendered to Vanden Bosch and he acknowledged that payment by giving Krepel the request for reconveyance, title revested, as a matter of law, in the debtor. The foreclosure by Krepel, therefore, was invalid and Bonham (Krepel) did not become a bona fide purchaser at that sale. Nevertheless, the trial court further held that the appellants could, themselves, have become bona fide purchasers from Krepel had they been without notice of Krepel's fraud. Irregularities in the title record of the subject property and in its sale to Sweeny and the Etchegoyen's, however, placed the appellants on notice that Krepel's title to the property was defective. These irregularities included:

a) The fact that no recording had been made of Vanden Bosch's assignment of his trust deed to Bonham;

b) The fact that although an amendment to their escrow instructions shows that the Hamill/Wilcox $35,000 deed of trust, recorded July 11, 1979, was paid, neither Sweeny nor the Etchegoyens sought a reconveyance under that deed of trust;

c) The fact that Sweeny had acquired a lot or lots from Krepel before this sale, which had been foreclosed upon earlier and on which Sweeny had subsequently experienced title problems;

d) The fact that the original escrow instructions and their first amendment did not name the seller nor contain the signature of the seller;

e) The fact that these escrow instructions contained directions to pay a sales commission, but did not name the agent who was to receive the commission;

f) The fact that, after the escrow agreement was amended to make Sweeny a percentage participant in the deal, no attempt was made to reduce the purchase price to show this "payment" to an ostensible agent of Krepel;

g) The fact that the $100,000 purchase money note from the Etchegoyens was made payable to Bonham and Krepel, although the escrow instructions required that the note be payable only to Bonham;

h) The fact that the $100,000 deed of trust was not immediately recorded, thus permitting the Etchegoyens to obtain financing from the Pacific City Bank;

i) The fact that the $100,000 purchase money note was not shown on the title insurance policy;

j) The fact that the title insurance policy did not cover the full purchase price;

k) The "precipitous" closing of the sale, shortly after the attorney for Hamill and Wilcox contacted Krepel as to certain irregularities in Krepel's handling of the matter.

Given the "wide experience" of Sweeny and Craig Etchegoyen, the trial court found that these irregularities constituted adequate notice to the appellants to prevent them from asserting a bona fide purchaser status as to the Riverside County real property.

## II. ANALYSIS OF THE FACTS AND THE LAW

■ The appellants have raised eight issues on appeal. First, they contest the trial court's findings that a) Vanden Bosch returned the $6,500 check to Krepel, b) the Etchegoyens' check dated July 30, 1979, deposit slip dated July 31, 1979, and amended escrow instructions dated August 1, 1979, had been backdated, and c) the Continental Equities escrow was closed in a precipitous fashion. (Although the latter two findings were placed among the trial court's conclusions of law, they were in the nature of factual findings.) In reviewing the trial record, the panel believes that adequate evidence exists upon which the trial court

could have made these findings. The findings are not, therefore, clearly erroneous. Fed.R.Bankr.P. 810.

■ The appellants' second issue goes to the subject-matter jurisdiction of the bankruptcy court to entertain an action concerning this real property, when recorded title to the same now resides in non-debtors. The trial court overcame this complaint by finding that title to the subject property had automatically returned to the debtor when Hamill and Wilcox paid the amount owing the Vanden Bosches in full. Regardless of whether this reasoning would withstand our scrutiny, the panel notes that the said real property was, at one point, unquestionably owned by the debtor. This property was then transferred from the debtor in a manner which was arguably fraudulent and, therefore, subject to avoidance under a number of statutory and common law grounds, including 11 U.S.C. §§ 544 & 550 (West Supp. 1982) and California real property law. With respect to the rights of the trustee under section 544 of the Bankruptcy Code, it should be noted that, although the trustee did not originally file as a plaintiff in this proceeding (having been originally listed as a defendant), he apparently joined the cause of the plaintiffs at the time of trial. Thus, whatever the outcome of the cause of action brought below, the trial court clearly had the authority to entertain this action as one "arising in or related to" a case under Title 11 of the United States Code. 28 U.S.C. § 1471(b) (West Supp. 1982).

■ As their third point of error, the appellants observe that Pacific City Bank also has a claimed interest in the Riverside County property, resulting from its $110,000 loan to the Etchegoyens. They then maintain that Pacific City Bank should have been joined as an indispensable party in the instant action. In this regard, Rule 719(a) of the Federal Rules of Bankruptcy Procedure provides:

"A person who is subject to service of process shall be joined as a party in the proceeding if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the proceeding and is so situated that the disposition of the proceeding in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff."

In examining each of the above cases for finding a party indispensable, the panel first notes that the appellees have not sought to avoid Pacific City Bank's interest in the subject real property. Thus, the bank will not be harmed by the trial court's determination. Similarly, the panel does not see how the present appellants have been or will be injured by the nonjoinder of the bank. They still owe a primary personal obligation to the bank, which may be reduced or avoided completely through the bank's recovery against the Riverside County Property. The fact that the latter recovery may be impeded by the debtor's case under Title 11 is not the result of the nonjoinder of the bank, but of the statutory bankruptcy rights of Farmer's Market, which do not ultimately destroy the bank's interest in this real property. The panel does not find error in the non-joinder of Pacific City Bank.

The fourth issue raised by the appellants questions the decision of the trial court in placing the burden of proof upon the appellants to show their bona fide purchaser status. In arguing their position, the appellants cite several California state court cases, which place the burden of proof upon those claiming the non-bona fide nature of those who have purchased and hold recorded title to real property. *See Firato v. Tuttle*, 48 Cal.2d 136, 308 P.2d 333 (1957); *Ferguson v. Ferguson*, 58 Cal.App.2d 811 (1943); *Bell v. Pleasant*, 145 Cal. 410, 78 P. 957 (1904).

■ On this point, the panel finds that it must agree with the appellants that the trial court erred in placing the burden of proof upon the holders of the recorded title to this property, who have given value (though not necessarily a fair consideration) for their real property interest. *See* 2 H. Miller & M. Starr, Current Law of California Real Estate, *Recording and Priorities*, § 11.28, at 52–53 (Rev. ed. 1977); *Bell v. Pleasant, supra; Wyrick v. Weck,* 68 Cal. 8, 8 P. 522 (1885); *Fly v. Cline,* 49 Cal.App. 414, 193 P. 615 (1920). In this regard, the appellees' reference to burden of proof under the federal bankruptcy law governing fraudulent transfers, *see* 4 Collier on Bankruptcy ¶ 548.10, at 548–108 & n. 6 (15th ed. 1981), is inappropriate. Although section 548 of the Bankruptcy Code was cited by the appellees in support of their complaint, both below and at oral argument before this panel, the trial court relied only upon California law holding the foreclosure sale by Krepel and the subsequent sale to the appellants to be invalid.

It may be argued, of course, that the ultimate basis for a bankruptcy trustee's ability to recover estate property is still under federal bankruptcy law, *i.e.,* 11 U.S.C. § 550 (West Supp. 1982). Nevertheless, no particular burden of proof standard is established as to this section of the Bankruptcy Code. The panel sees no reason why a different burden of proof standard should be applied when a bankruptcy trustee seeks to set aside a fraudulent conveyance under state law, than when a creditor attempts to utilize the same law in a non-bankruptcy setting. Therefore, the panel holds that the California burden of proof standard should have been applied in this case.

## III. CONCLUSION

■ In light of this holding, the further issues raised by the appellants need not be addressed by the panel. Instead, the matter will be remanded to the trial court to make new findings and conclusions, with the burden of proof being placed upon the plaintiffs to show that the appellants lacked good faith in their purchase of this real property. In so doing, the panel is cognizant of the argument of the appellees that, notwithstanding the trial court's possible misplacement of the burden of proof, adequate evidence exists to establish bad faith on the part of the appellants. In cases involving claims of fraud and bad faith, however, the panel feels that decisions of fact are most properly the province of the trial court, pursuant to an application of proper legal standards. Nothing in the trial court's MEMORANDUM OF DECISION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW or in its JUDGMENT leads the panel to believe that the lower court's finding of bad faith would remain the same, despite a shift in the burden of proof to the appellees. It does not, therefore, feel it proper to withdrawn from the trial court the opportunity to reanalyze its own factual appraisal, in light of this change in the burden of proof.

Reversed and remanded for further proceedings not in conflict with this decision.